**COMMONWEALTH of Kentucky,**
**Appellant**

**v.**

**Mohamud ABUKAR, Appellee**

**2014-SC-000417-DG**

Supreme Court of Kentucky.

RENDERED: SEPTEMBER 22, 2016

COUNSEL FOR APPELLANT: Andy Beshear, Attorney General of Kentucky, David Bryan Abner, Assistant Attorney General

COUNSEL FOR APPELLEE: Dace A. Lubans-Otto, Alexandra Lubans-Otto, Attorney PLLC

## OPINION OF THE COURT BY JUSTICE VENTERS

Appellee, Mohamud Abukar, a United States citizen and a native of Somalia, was convicted of first degree rape in Kenton Circuit Court and sentenced to twelve years in prison. The Court of Appeals reversed the judgment upon its conclusion that the trial court's failure to provide Abukar with a Somali interpreter for his rape trial violated KRS 30A.410.[1]

The Commonwealth sought discretionary review of that decision, arguing that the trial court properly acted within its discretion when it denied Abukar's request for an interpreter at the trial of the case. For reasons set forth below, we reverse the opinion of the Court of Appeals based upon our conclusion that the trial court acted well within its discretion when it determined that Abukar was not entitled to an interpreter.

Abukar had also raised two other issues in his appeal to the Court of Appeals. The Court of Appeals rejected his claim that the trial court erred when it denied his motion to suppress evidence acquired when he was detained without probable cause. Abukar has not asked for further review of the suppression issue and so that ruling of the Court of Appeals stands unchallenged. Abukar also presented the Court of Appeals with an argument under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which it declined to address because it reversed his conviction on other grounds and remanded the case for a new trial in the circuit court. Because we reverse the Court of Appeals with respect to the issue of the interpreter, we must also remand the matter to the Court of Appeals to consider Abukar's *Batson* issue.

## I. FACTUAL AND PROCEDURAL BACKGROUND

According to the evidence presented at trial, the victim and her boyfriend left a Newport, Kentucky, nightclub under the influence of alcohol, and entered a taxi where they passed out before telling the

---

**1.** The official languages of Somalia are Somali and Arabic; Abukar's native language is Somali.

driver where to take them. Several hours later, the victim awakened in the cab to find the taxi driver forcibly raping her. As she awakened, the driver immediately got off of her. He returned to the driver's seat and drove away. Still in the cab with her boyfriend, the victim spotted a familiar store and told the driver to stop. She and her boyfriend, who was by this time also awake, exited the cab and went into the store. The taxi drove away.

The victim reported the events to the Erlanger Police Department. Police officers interviewed the couple and arranged for the victim to undergo a forensic rape examination at a nearby hospital. Eventually, Abukar was identified as the cab driver. He was stopped by police, brought to the police station, and questioned by a detective. During a recorded interview with police, Abukar acknowledged that he had picked up the victim and her boyfriend, and that they remained in his taxi for some five hours after they passed out. He denied that he had any sexual contact with the victim. Abukar was subsequently arrested and charged with first-degree rape.

Abukar appeared before the trial court at various times, sixteen in all, during the pretrial process. The question of whether an interpreter was needed was raised virtually from the beginning of the case. Early in the proceedings, defense counsel informed the trial court that Abukar would not require an interpreter for every routine status hearing, explaining that Abukar

had obtained his United States citizenship, which requires English literacy,[2] and that he drove a cab for a living and could, indeed, speak everyday English.

At a status conference several months before the trial, the following exchange occurred:

> **Court:** Do we have any kind of language barrier here, or is there a need for an interpreter?
>
> **Defense Counsel:** We will be asking for an interpreter with any type of proceedings due to the complexity of it. He is a U.S. citizen so his English is adequate for brief appearances, but if we go to trial we will need interpreters.
>
> **Court:** Are you able to understand, Mr. Abukar, the essence of what is going on in court?
>
> **Abukar:** Yes, I understand.

At another conference one month later, the issue was again discussed in the context of the anticipated suppression hearing.

> **Court:** Are we going to need an interpreter of any kind?
>
> **Defense Counsel:** For trial we will need an interpreter.
>
> **Court:** What language?
>
> **Defense Counsel:** Somali language.

At yet another status hearing, during a discussion of DNA issues, defense counsel said she would be using an interpreter to discuss those issues with Abukar, stating, "That being said, I would like to go over this with him with a certified interpreter just because it's very complicated for any-

---

**2.** Obtaining U.S. citizenship is a process which requires, among other things, a demonstration of proficiency in the English language. "An applicant may prove that he has met the citizenship requirement in three ways: (1) by showing proficiency in the English language and in U.S. history by passing the required tests pursuant to 8 C.F.R. §§ 312.1 and 312.2; (2) by obtaining a high school diploma or GED in the U.S. that con-

tains an English proficiency requirement; or (3) satisfying the citizenship skills requirement by showing he: 'has attended, or is attending, a state recognized, accredited learning institution in the United States, and that institution certifies such attendance....' " *Barbour v. Holder*, 2010 WL 2629070 at *3 (D.N.J.2010) (citing 8 C.F.R. § 245a.17(a)(1)–(3)).

one. It's especially so for anyone whose first language is not English."

In anticipation of a pending suppression hearing[3], defense counsel acknowledged that "Mr. Abukar's English is good basic English and he can get through life fine with it, but when it comes to legal terminology, out of an abundance of caution I think it's best to use an interpreter." Counsel added, "Language is one part of it and there are cultural aspects too. But that being said, he has good basic English. There's going to be terminology introduced here where I think an interpreter would help."

The trial court arranged to have a Somali interpreter to assist Abukar at the suppression hearing. In the course of that hearing, several minutes of the video recording of Abukar's post-arrest interview with the police was presented as evidence and, of course, viewed by the trial court. Seeing and hearing Abukar's recorded dialogue with the police investigator and observing Abukar's interaction with counsel during the hearing impressed the trial court that Abukar had a sufficient command of the English language to proceed to trial without the added assistance of an interpreter. At the conclusion of the suppression hearing, the Court addressed the issue as follows:

> **Court:** It's clear throughout the conversation that [Abukar] understands English as well as I do. I don't even know why we spent the money bringing this interpreter up here today, delaying this hearing for two or three hours. Able to point out to the cop what's inaccurate on them, gives the exact correct information. Talks about the weather. Responds appropriately. Talks about his inaccurate address. Every other conversation that

takes place. Talks about his nickname. Every other conversation that takes place, whatever is asked the responses are appropriate to what's being asked. He understands English. To the extent he knows derogatory terms for intercourse.
>
> **Defense Counsel:** Are you not going to ask for an interpreter for the trial, your honor?
>
> **Court:** I don't think we need one. Looks to me he understands English as well as you and me.
>
> **Defense Counsel:** Maybe it would help with your decision if you watched the entire tape from the interview. I saw a lot of problems in it and that may give some insight as to his grasp of specific English.
>
> **Court:** We'll err on the side of safety and have a Somali interpreter.

Despite this initial assurance at the end of the suppression hearing that, "erring on the side of safety," an interpreter would be available at trial, the court ultimately declined to arrange for an interpreter. On the morning of the trial, it issued findings of fact for the suppression hearing including this finding regarding Abukar's comprehension of the English language:

> Abukar clearly understands English, so much that this Court now questions the continuing need of a Somali interpreter in the herein proceedings. The Court notes that Abukar has appeared in Court on this case on January 4, 2011 (arraignment), February 8, 2011 (pretrial), March 14, 2011 (pretrial), March 21, 2011 (pretrial), April 18, 2011 (pretrial), July 18, 2011 (pretrial), August 2, 2011 (pretrial), August 8, 2011 (pretrial), and August 29, 2011 (pretrial). Abukar

---

**3.** Abukar moved to suppress evidence obtained by police during his initial detention and arrest. The grounds for his suppression motion, which the trial court denied, are not relevant to our review.

appeared at each of these scheduled events without the benefit of a Somali interpreter.... Abukar appeared to fully understand what transpired at each of these Court appearances. It was not until the suppression hearing raised its head did the need for a Somali interpreter surface for the first time. This Court is confident that Abukar has an adequate understanding of the English language.

Defense counsel was surprised to receive this finding on the morning of trial after the court's previous indication that it would err on the side of having an interpreter. Counsel again asserted Abukar's need for a Somali interpreter and objected to the trial court's failure to obtain one. Counsel did not request an evidentiary hearing or a continuance of the trial. The trial court stated that it had "an adequate record on this and I assume you're just preserving your objection." The trial court again noted that the many pretrial proceedings did not require an interpreter, and stated that the suppression hearing convinced him that Abukar's ability to communicate in English without an interpreter was sufficient for trial purposes.

On appeal from his conviction, the Court of Appeals reversed based upon the trial court's denial of Abukar's request for an interpreter. We granted the Commonwealth's motion for discretionary review. The sole issue before us is whether the Court of Appeals correctly determined that the trial court erred by failing to appoint an interpreter for Abukar to assist him at trial.

## II. ANALYSIS

The Commonwealth argues that the Court of Appeals erred by second-guessing the trial court's assessment of Abukar's

English language skills, and finding instead that "a higher mastery of the [English] language might be necessary to thoroughly understand all of the complexities of a trial" than was needed for a conversation with police about the victim's allegations.[4] The Court of Appeals concluded that "in the interest of caution and safeguarding [Abukar's basic constitutional] rights, the appointment of an interpreter is necessary."

Abukar urges that we affirm the Court of Appeals, noting all of the complexities of the trial that may not be readily understood by one whose native tongue is not English, and especially notes the unfair burden placed upon trial counsel when the trial court failed to provide prior warning that an interpreter would not be available at trial.

### A. KRS 30A.400 *et. seq.*—Court Interpreters

■ Codified within KRS Chapter 30A, entitled "Court Personnel," KRS 30A.400 through KRS 30A.425 directs the court's use of interpreters. KRS 30A.410(1) provides the following:

(1) *The court in any matter, criminal or civil, shall appoint a qualified interpreter or interpreters,* to be paid out of the State Treasury, *for the following categories of persons, whether they are parties, jurors, or witnesses:*

(a) Persons who because of deafness or hard of hearing:

 1. Use sign language, such as pidgin, signed English, American Sign Language, or gestures; or

 2. Are oral/aural and use interpreters and assistive technology, as their primary mode of communication;

4. The Court of Appeals reached its decision in a two-vote majority; the third judge issued a dissenting opinion agreeing with the trial court's findings on the issue.

(b) *Persons who cannot communicate in English;* and

(c) Any other person who has, in the opinion of the court, another type of disability which will prevent him from properly understanding the nature of the proceedings or substantially prejudice his rights.

(Emphasis added.)

■ While only subsection (b) is relevant to our review, we set out the full section to add context to our review; the same principles we discuss regarding subsection (b) would apply equally to subsections (a) and (c).[5] What is meant by the statutory phrase "persons who cannot communicate in English" is, of course, open to interpretation. In its most narrow construction, the phrase could be regarded literally as protecting only those who lack the most basic, rudimentary skill in English comprehension. However, when interpreting a statute we are bound to consider the legislative purpose behind the law: "this Court must be guided by the intent of the legislature in enacting the law." *County of Harlan v. Appalachian Regional Healthcare, Inc.*, 85 S.W.3d 607, 611 (Ky.2002).

Subsection (1)(c) of KRS 30A.410 discloses the legislative objective of accommodating with an interpreter any person with a disability that "will prevent [the participant in a court proceeding] from understanding the nature of the proceedings" or will "substantially prejudice his rights." We conclude that this express statutory standard generally applicable to any disability that impedes communication is the same standard to be applied for the specific linguistic deficiency set forth in Section (1)(b) for persons who cannot communicate in English. For purposes of KRS 30A.410(1)(b), a person who "cannot communicate in English" means a person whose rights will be substantially prejudiced because of a deficiency in English language skills of either comprehension or expression such that he or she is unable to understand the nature and consequences of the court proceeding or is unable to participate rationally and coherently in the proceeding.

The Court of Appeals applied a different standard, going outside the statutory framework to suggest that an interpreter is required for trial participants whose "mastery of the language" does not enable them to "thoroughly understand all of the complexities of a trial." Even the most fluent speakers of the English language often lack a thorough understanding of the complexities of a trial. Understanding trial

---

5. The Federal analogue is the Court Interpreters Act, 28 U.S.C. §§ 1827, 1828 ("CIA"), which provides, in relevant part: "The presiding judicial officer ... shall utilize the services of the most available certified interpreter ... in judicial proceedings instituted by the United States, if the presiding judicial officer determines on such officer's own motion or on the motion of a party that such party (including a defendant in a criminal case) ... (A) speaks only or primarily a language other than the English language ... so as to inhibit such party's comprehension of the proceedings or communication with counsel ...." "[T]he CIA was not enacted to 'create new constitutional rights for defendants or expand existing constitutional safeguards'; rather, the CIA was enacted 'to mandate the appointment of interpreters under certain conditions and to establish statutory guidance for the use of translators in order to ensure that the quality of the translation does not fall below a constitutionally permissible threshold.'" *United States v. Johnson*, 248 F.3d 655, 661 (7th Cir.2001) (quoting *United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir.1990) (citing H.R.Rep. No. 1687, 95th Cong., 2d Sess. at 2-4 (1978), reprinted in, 1978 U.S.Code Cong. & Admin.News 4652, 4652-54)). Because the objectives of the federal interpreter appointment statute are similar to our own, and the same constitutional considerations are at stake, it is appropriate for us to consult federal court authorities in addressing these issues.

complexities is as much an issue of legal education as it is English comprehension. KRS 30A.410 does not provide interpreters to educate the trial participant on the intricacies of American legal proceedings or the traditions of our legal culture that may be foreign to nonnative English speakers. Nor is it the purpose of an interpreter to impart an understanding of technologically complex scientific evidence, such as the DNA analysis involved in this case. The interpreter's function is to enable the non-English speaker to properly understand the nature of the court proceedings.

Upon a finding of the essential fact that a party, juror, or witness "cannot communicate in English," the appointment of an interpreter is mandatory. KRS 30A.410 states: "The court in any matter, criminal or civil, *shall* appoint a qualified interpreter ...." (Emphasis added.) The trial court possesses no discretion in the matter, and *must* appoint an interpreter when the factual predicate prescribed by the statute exists.

■ The determination of that factual predicate is an issue of fact. "[W]e defer to the trial court's findings of fact if they are not clearly erroneous. Findings of fact are not clearly erroneous if they are supported by substantial evidence." *Commonwealth v. Jennings,* 490 S.W.3d 339, 346 (Ky.2016) (citing *Simpson v. Commonwealth,* 474 S.W.3d 544, 546–547 (Ky.2015)). Substantial evidence means evidence that when "taken alone or in light of all the evidence ... has sufficient probative value to induce conviction in the minds of reasonable men." *Moore v. Asente,* 110 S.W.3d 336, 354 (Ky.2003) (citation omitted).

■ Although the trial court did not conduct a special evidentiary hearing for the purpose of determining the adequacy of Abukar's ability to communicate in English, it clearly heard and observed much throughout the extensive pretrial proceedings to evaluate the issue at hand. KRS 30A.400(3) provides that "If the eligibility of the individual for an interpreter is challenged, the judge *may,* on good cause shown, hold a hearing to determine the bona fide need for interpreter services." (Emphasis added.) Conducting an evidentiary hearing devoted to the issue was within the trial court's discretion. In the usual situation where an individual has a measurable degree of English language skills but contends to be unable to communicate to the extent required by the statute, the trial court should avail itself of the provisions of KRS 30A.400(3) and undertake an evidentiary hearing to inquire into, and to preserve for the record, the English language proficiency status of the individual requesting an interpreter.

■ Certainly an evidentiary hearing dedicated to the purpose of assessing Abukar's ability would have been preferable, at least in the initial phases of the case before any other pretrial appearances occurred to provide insight. However, the trial court's ultimate findings that "Abukar clearly understands English," and "Abukar has an adequate understanding of the English language," and even Abukar's own response that he understands "the essence of what is going on in court," are all supported by sufficient evidence such that we are unable to denounce them upon appellate review as clearly erroneous.[6] "If the trial judge's findings of fact in the underly-

---

**6.** We have reviewed the police interview recording that influenced the trial court during the suppression hearing. While the recording does not disclose Abukar's education, intelligence, his time spent in English-speaking countries, or other factors, it does indeed disclose that Abukar possesses a sophisticated, albeit heavily accented, level of competency in the English language.

ing action are not clearly erroneous, *i.e.*, are supported by substantial evidence, then the appellate court's role is confined to determining whether those facts support the trial judge's legal conclusion." *Commonwealth v. Deloney*, 20 S.W.3d 471, 473–474 (Ky.2000). In effect, the Court of Appeals erroneously substituted its own determination of the facts for that of the trial court. Consequently, we reverse the Court of Appeals and reinstate the findings of the Kenton Circuit Court.

## B. Constitutional Issues

In addition to the statutory requirements listed above, a defendant in a criminal case who cannot communicate in English will, in the usual case, be entitled to the appointment of an interpreter as a constitutional matter. For example, a defendant has a right to a fair trial, the right to assistance of counsel, and the right to confront witnesses; if he cannot understand what is being said at trial and cannot communicate with his English-speaking attorney, these constitutional rights are obviously negated.

 "As a constitutional matter, in determining whether an interpreter is needed, the trial court must balance the defendant's rights to due process, confrontation of witnesses, effective assistance of counsel, and to be present at his trial 'against the public's interest in the economical administration of criminal law.'" *United States v. Edouard*, 485 F.3d 1324, 1338 (11th Cir.2007) (quoting *Valladares v. United States*, 871 F.2d 1564, 1566 (11th Cir.1989)). Because a constitutional right is at stake, any examination of an erroneous decision by the trial court in failing to appoint an interpreter for harmless error would be guided by the "harmless beyond a reasonable doubt" standard. *Barth v. Commonwealth*, 80 S.W.3d 390, 395 (Ky. 2001) (citing *Chapman v. California*, 386

U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)) ("before a federal constitutional error can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt."). Because we conclude that the trial court's determination that Abukar could communicate in English is supported by sufficient evidence, and thus not error at all, we need not undertake a harmless error analysis.

Obviously, what qualifies as an inability to communicate in English to the extent of being unable to "properly understand the nature of the proceedings" or otherwise suffer "substantial prejudice to [one's] rights," KRS 30A.410(1)(c), will vary depending upon the "nature of the proceedings." For example, in the trial of a relatively straight-forward, simple theft by unlawful taking charge, such as shoplifting, a lesser degree of English proficiency may suffice which otherwise would be inadequate in a more complex matter such as a termination of parental rights case or a prosecution for defrauding a secured creditor. The type of case as a component of the "nature of the proceedings" will be a crucial factor in a trial court's ultimate decision on whether an interpreter should be appointed. It is also true, as recognized by all parties in the instant action, that the "nature of the proceeding" varies within the case itself, such that the command of English required for a hearing to set a trial date will differ from language skills needed to participate in an arraignment or a suppression hearing or a trial.

## III. CONCLUSION

For the foregoing reasons, the decision of the Court of Appeals is reversed and the case is remanded to the Court of Appeals with directions to consider the remaining issue of Abukar's appeal: whether

the trial court erred in denying his *Batson* challenge.

All sitting. All concur.