RENDERED:  DECEMBER 1, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0254-MR

DONJUAN JOHNSON                                              APPELLANT

v.                 APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE SARAH E. CLAY, JUDGE
ACTION NO. 20-CR-001789

COMMONWEALTH OF KENTUCKY                            APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; ECKERLE AND TAYLOR, JUDGES.

ECKERLE, JUDGE:  This matter-of-right criminal appeal raises a sole issue regarding an alleged racial motivation by the Commonwealth during its exercise of one peremptory challenge.  Finding no error, we affirm.

## BACKGROUND

The facts underlying the conviction are not disputed. Donjuan Johnson was indicted by a Jefferson County Grand Jury, which charged Johnson with one count of First-Degree Wanton Endangerment and one count of Fourth-Degree Assault for actions committed against the same victim, T.A.

In short form, Johnson strangled and struck T.A. in the face during a discussion about their breakup. They had dated for six months prior to T.A. breaking up with Johnson. Following a phone call during which T.A. agreed to talk with Johnson about the breakup, T.A. went to Johnson's mother's house. T.A. stayed in her truck while talking with Johnson. T.A. believed Johnson had been drinking, so she declined to get out of the vehicle per Johnson's request, which led to a verbal argument and eventually a physical altercation. Johnson somehow reached into the truck and began to strangle T.A., who thought she was dying and felt herself "leaving."

Johnson's mother came out and, according to T.A., told Johnson to get off of T.A. All three then went into the house at Johnson's direction. T.A. could not see well, so she did what Johnson said. T.A. stated that Johnson broke a window and also threw a chair at T.A. Johnson was then screaming about things that were bothering him in his life, none of which had to do with T.A., who tried to calm Johnson down by cleaning up broken glass and being nice to Johnson. She

was at the house for about nine hours before managing to escape to her truck. T.A. went to her cousin's house, and her cousin called the police. EMS took T.A. to the hospital, where several photographs of her bloodied and bruised condition were taken. She had broken blood vessels in her eyes, a busted lip, and strangulation marks around her neck. The photographs of T.A.'s injuries were shown to the jury. The prosecution introduced other testimony, including a nurse who testified about common injuries caused by strangulation, including broken blood vessels.

Johnson's mother testified in his defense. She witnessed the fight between Johnson and T.A. but saw neither strangulation nor the beginning of the fight. She testified that T.A. was throwing punches at Johnson. She saw that T.A. had glassy eyes and thought that meant T.A. had been drinking. She denied that her son threw a chair and claimed that everyone was acting normally during the time spent in the house.

A jury found Johnson guilty of both charges and recommended a total imprisonment sentence of four years. The Trial Court followed the jury's recommendation and sentenced Johnson to imprisonment for four years. Johnson timely appealed. Additional facts pertinent to the sole issue on appeal are detailed below.

## ANALYSIS

Johnson's sole issue on appeal is a *Batson* challenge to the Commonwealth's use of a peremptory challenge on a Black prospective juror. *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). We first outline the proper legal standards for a *Batson* claim, and then discuss the facts and analyze them in light of those legal standards.

**A. Legal standards for *Batson* challenges.**

*Batson* requires a three-step process for evaluating a claim that a prosecutor's peremptory challenge was used in a manner violating the Equal Protection Clause of the United States Constitution. *Commonwealth v. Snodgrass*, 831 S.W.2d 176, 178 (Ky. 1992). First, the defendant must make a *prima facie* showing that the prosecutor exercised the challenge on the basis of race. *Id*. If that showing is made, the prosecution must articulate a race-neutral reason for the strike. *Id*. Finally, the Trial Court must then determine whether the defendant has met his burden of proving purposeful discrimination. *Id*. at 178. Appellate review may be limited to the second and third prong. If the prosecutor offers a race-neutral explanation, and the Trial Court rules on the ultimate issue of intentional discrimination, then whether there was a *prima facie* showing becomes moot. *Id*. at 179. *See also Hernandez v. New York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 1866, 114 L. Ed. 2d 395 (1991) ("Once a prosecutor has offered a race-neutral

-4-

explanation for the peremptory challenges, and the [T]rial [C]ourt has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made *a prima facie* showing becomes moot.").

Appellate review gives "great deference" to the Trial Court's analysis because that analysis is "based upon issues 'peculiarly within the trial judge's province,' such as the 'demeanor and credibility of the prosecutor.'" *Ross v. Commonwealth*, 455 S.W.3d 899, 906 (Ky. 2015) (footnotes and citations omitted). "A trial court's denial of a *Batson* challenge is reviewed for clear error." *Abukar v. Commonwealth*, 530 S.W.3d 915, 917 (Ky. App. 2017) (citing *Washington v. Commonwealth*, 34 S.W.3d 376, 380 (Ky. 2000)).

## B. Facts surrounding the *Batson* challenge.

The venire persons in the instant case were comprised of people from different races and genders. During *voir dire*, some of the venire persons were initially seated in certain places and later shuffled to others. Though the video and audio quality make for a challenging review of the record, the parties' briefs have done yeomans' jobs in providing ample detail about the locations of various jurors, including where they initially sat and where they finally sat. We would be remiss to not acknowledge both parties for providing ample citations to the record in conformity with our briefing rules. *See* RAP[1] 32(A)(3)-(4) ("ample references to

---

[1] Kentucky Rules of Appellate Procedure.

the specific location in the record"); RAP 32(B)(3)-(4). The details provided in the briefs coupled with our review of the record show that, indeed, there was some shuffling of seats amongst the venire persons. Though not dispositive of the *Batson* challenge, this shuffling could have caused some confusion about which venire person was sitting in which seat.

Following *voir dire* and the Commonwealth's exercise of a peremptory strike on Juror 28, Johnson presented a *Batson* challenge. The Trial Court then asked the Commonwealth for its race-neutral reason for the strike. The Commonwealth initially offered that the juror was a white female whom the prosecution tried to engage a few times, but the juror seemed disinterested. The Commonwealth noted that it was striking the juror because the juror was not engaged – the juror did not speak, did not address anything, did not ask any questions, and did not ask to approach the bench. Johnson initially argued they were not talking about the same juror, as Juror 28 was a Black male. The lead prosecutor then explained she may have erred when the jurors were being shuffled around in the back row, but she maintained that the juror was non-communicative, and that was the reason for the strike.

The Trial Court stated that according to her notes, Juror 28 was a male who did not say anything. The Trial Court could not recall if the person was Black, but she did note that the venire person did not say anything at all. The

parties then discussed that the jurors had been shuffled around in some seats at the beginning of *voir dire*, which may be the source of the confusion. The Trial Court then asked whether Juror 28 said anything at all, because the Trial Court had not written down that Juror 28 had said anything, and "that's a race-neutral reason to strike the individual." The Trial Court further noted the possibility that the Commonwealth was attempting to strike the wrong person.

The Commonwealth then responded that it was not trying to strike the wrong person. The Commonwealth noted that it tried to keep track of race as a reminder "if we ever need to have another reason to strike somebody for other reasons that were race neutral, but this is an individual I thought was a white woman." The lead prosecutor disclaimed any intention to use race as a reason to strike any of the venire persons. Furthermore, the lead prosecutor noted Juror 28 did not say anything and would not engage or make eye contact with the Commonwealth. The Trial Court then had the prospective jurors re-enter the courtroom and sit in their seats to figure out who Juror 28 was.

After the prospective jurors re-entered and sat in their seats, Juror 28 was, indeed, a Black male. Following this clarification, the Trial Court asked the Commonwealth if it still intended on striking Juror 28, and if so, to offer the race-neutral reason. The Commonwealth continued with its peremptory challenge of Juror 28 and stated:

Judge, for 28, my race-neutral reason was I had it written down as somebody that was, of course, the wrong skin color and gender, so I was not striking anyone I thought was a Black male. A white woman who I thought was sitting there. They weren't saying anything. They never made eye contact, and I had it written down as would not make eye contact with me, and, uh, didn't say anything. I have a blank that I remember not having anything on there. Counsel had nothing on there. I had the wrong gender written down, so obviously I did not choose a race motivated reason to strike 28. We were just going through, and people who didn't say anything were getting struck because they didn't say anything.

Video Record (VR) 11/30/22, 12:11:46.

The Trial Court accepted these reasons as race neutral. The Trial Court held that both the misbelief that Juror 28 was a white woman and the fact that the juror said nothing at all were both race-neutral reasons for exercising a peremptory strike on Juror 28.

### C. Did the Trial Court err by overruling the *Batson* challenge?

Johnson claims the Trial Court erred by finding the Commonwealth's reasons were race neutral. Johnson argues that a racially-motivated reason for the strike is shown because the Commonwealth initially wanted to strike what it believed was a white female who was nonresponsive but ultimately proceeded to strike a Black male. Johnson claims that the Commonwealth had an opportunity to refrain from striking Juror 28 and could have changed its strike to a white female

who was sitting near Juror 28, as she was likely the juror the Commonwealth mistook as Juror 28 when the shifting of jurors occurred during *voir dire*.

The Commonwealth in response argues that once the parties realized the error, the trial prosecutor never really requested that Juror 28 be struck. Instead, the Commonwealth notes that the trial prosecutor had no reason to request that her strike move to the white female juror, as Johnson had already exercised one of his peremptory challenges on that juror. Instead, the Commonwealth maintained that its race-neutral reason for the strike was a mistaken belief that it was not striking a Black male. The Commonwealth claims that it was the Trial Court that "essentially shifted the peremptory strike to [the Black male], even though the prosecutor did not ask [the Trial Court] to do that." Appellee's Brief at 15.

We do not agree with the Commonwealth's novel interpretation of the facts. The Trial Court asked the Commonwealth if it intended on striking Juror 28, and, if so, what was the race-neutral reason for striking Juror 28. The Commonwealth then proceeded to give its race-neutral reasons for striking Juror 28: (1) mistakenly writing down that Juror 28 was a white female; and (2) striking all jurors who were non-responsive. Clearly, the Commonwealth intended on striking Juror 28 after the clarification that Juror 28 was a Black man.

-9-

The Trial Court accepted the Commonwealth's reasons as race-neutral, thus we do not review whether Johnson made a *prima facie* showing. *Snodgrass*, *supra*, and *Hernandez*, *supra*. Instead, we review the second and third steps in *Batson* where the Trial Court must evaluate the reasons given and determine if the challenger has met his burden of proving purposeful discrimination. *Abukar v. Commonwealth*, 530 S.W.3d at 918. While conducting our appellate review, we are cognizant that the Trial Court's findings are "'peculiarly within a trial judge's province'" and will "not be disturbed unless clearly erroneous." *Washington*, 34 S.W.3d at 379-80 (quoting *Snodgrass*, 831 S.W.2d at 179). The Trial Court is assessing the credibility and demeanor of the attorneys before it and evaluating the attorneys' states of mind. *Abukar*, 530 S.W.3d at 918 (citations omitted). In light of these standards and the evidence adduced at the trial, we find no clear error with the Trial Court's ruling that the Commonwealth's race-neutral reasons are valid and not pre-textual.

First, the Trial Court accepted as a race-neutral reason that the Commonwealth mistakenly believed that Juror 28 was a white woman. This finding is supported by substantial evidence in the record. There was a mix-up with the seating of the venire persons during *voir dire*. One of Johnson's defense counsel even proffered that two of the venire persons "were switched, like,

-10-

accidentally" and admitted, "I guess, Judge, there's some confusion, I guess, as to who was sitting in seat 28." VR 11/30/22, 12:03:05.

Having reviewed the record, there is substantial evidence to support that the Commonwealth erred when writing down the race and gender of Juror 28. Notably, other jurisdictions hold that honest mistakes are not evidence of racial bias. *See, e.g.*, *Aleman v. Uribe*, 723 F.3d 976, 982 (9th Cir. 2013) ("[I]f a prosecutor makes a mistake in good faith, such as an innocent transposition of juror information, then that mistake does not support the conclusion that the prosecutor's explanation is clearly not credible."); *United States v. Watford*, 468 F.3d 891, 912 (6th Cir. 2006) (prosecutor mistakenly listed the juror as white); *United States v. Burrus*, 375 F. App'x 323, 324 (4th Cir. 2010) (prosecutor mistakenly struck Black juror while intending to strike juror who was asleep during jury selection); *State v. Gonzalez-Sandoval*, 431 P.3d 850, 859 (Kan. 2018) (collecting cases). The Trial Court found the prosecutor's reason to be credible, and we afford great deference on appeal to that factual finding. *Roe v. Commonwealth*, 493 S.W.3d 814, 827 (Ky. 2015). Accordingly, the Trial Court's acceptance of this reason was not clearly erroneous.

Second, the Trial Court accepted as race neutral the Commonwealth's stated reason that it intended on striking the non-responsive jurors. Johnson argues that the Trial Court erred in finding a juror's failure to speak or engage is a race-

-11-

neutral reason to exercise a peremptory challenge. Johnson cites *Miller-El v. Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005), *Foster v. Chatman*, 578 U.S. 488, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016), and *Ross*, 455 S.W.3d 899. These cases are all distinguishable as they all involved substantial evidence of the prosecution's discriminatory purposes.

*Miller-El* was a death-penalty case where prosecutors effectively removed 91% of Black potential jurors, including using peremptory strikes on 10 of the 11 eligible Black venire persons. The prosecutors employed various racially-motivated tactics, including shuffling jurors and using more graphic questioning on Black jurors. And the Court could discern little difference between answers from Black and non-Black venire persons, leading the Court to conclude, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination[.]" 545 U.S. at 241, 125 S. Ct. at 2325.

*Foster* was also a death-penalty case where prosecutors effectively removed 100% of the Black potential jurors, including using peremptory strikes on all four of the eligible Black venire persons. The prosecution's research into the potential jurors included highlighting all Black venire persons and circulating the list amongst the prosecution's office for input on whether the potential jurors

should be stricken. The evidence also included numerous other documents where the Black potential jurors were identified, including a list of "definite NO's" identifying six names, five of which were qualified Black prospective jurors. And the evidence included the notes of an investigator for the prosecution where he opined, "If it comes down to having to pick one of the black jurors, [this one] might be okay." *Foster*, 578 U.S. at 494, 136 S. Ct. at 1744.

Finally, *Ross* concerned a *Batson* challenge where the prosecutor initially explained his reason for striking a Black female was: "In all honesty, I was striking women." 455 S.W.3d at 905. This "silver platter by the Commonwealth" made the *prima facie* showing of gender discrimination. *Id.* at 907. The prosecutor also made additional and substantial statements regarding gender differences during *voir dire*, including opining that his "[c]at used to be male but is no longer, so he might as well be female." *Id.* The Kentucky Supreme Court found the Commonwealth failed to provide gender-neutral justifications for striking two potential jurors when the prosecutor offered that he "picked the jurors that I thought were the jurors that I liked," which the Court deemed essentially a "gut feeling" or "prosecutor's instinct" justification. *Id.* at 908. Notably, however, the Court was expressly **not deciding** whether the Commonwealth's justifications for other prospective jurors were gender-neutral, including justifications that the jurors were, "looking 'amazed,' 'waffling,' and **not paying attention** . . . ." *Id.*

-13-

(emphasis added). In summary, *Miller-El*, *Foster*, and *Ross* involved substantial evidence of improper discriminatory intent underlying the peremptory challenges.

The instant case is not so infused with such evidence. The Commonwealth's rationale – striking jurors who were not paying attention and not responsive – was a race-neutral reason. *Thomas v. Commonwealth*, 153 S.W.3d 772, 778 (Ky. 2004) ("As demeanor is a race-neutral explanation, the Commonwealth met its burden of proof, shifting the burden back to Appellant."). It was also a reason that was factually supported by substantial evidence, including the Trial Court's own notes about Juror 28. Thus, the Trial Court's ruling on the *Batson* challenge is not clearly erroneous.

## CONCLUSION

Based on the record before us, the Trial Court's findings on Johnson's *Batson* challenge are supported by substantial evidence, and Johnson has not met his burden of proof. The Trial Court did not err, and we AFFIRM the judgment and sentence.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Michael C. Lemke
Louisville, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Jason Rothrock
Assistant Attorney General
Frankfort, Kentucky